UNION PAC. R. CO. (FISK v.). See Cases Nos. 4,827–4,830.

UNION PAC. R. CO. (FORT v.). See Case No. 4,952.

UNION PAC. R. CO. (FROST v.). See Case No. 4,952.

UNION PAC. R. CO. (HALL v.). See Case No. 5,950.

UNION PAC. R. CO. (HINES v.). See Case No. 6,521.

## Case No. 14,378.

UNION PAC. R. CO. v. LINCOLN COUNTY.

[1 Dill. 314; [1] 10 Am. Law Reg. (U. S.) 458.]

Circuit Court, D. Nebraska. 1871.[2]

TAXATION—POWER OF THE STATES—EXEMPTION OF FEDERAL INSTRUMENTALITIES.

1. The interest of the general government in the Union Pacific Railroad Company, though chartered and aided by congress, is not such as to exempt the company and its property from taxation by a state. through which the road is located and operated.

2. The doctrine of the implied exemption of federal instrumentalities from state taxation, considered and applied to this corporation, and the result reached, that it is not such an instrumentality; and if, in any case, it is such, the paramount rights of the government would not be affected, and. under the acts of congress, could not be injured by any subordinate right of the state to tax and sell the property of the corporation.

[Cited in Sweatt v. Boston, H. & E. R. Co., Case No. 13,684.]

3. Under the legislation of Nebraska, the county of Lincoln has the right to tax railroads in the unorganized country attached to it for revenue purposes.

On motion to continue the temporary injunction, heretofore allowed. The bill in this suit is filed to restrain the defendant, who is the county treasurer of Lincoln county, in the state of Nebraska, from proceeding to collect taxes upon the property of the complainant. assessed and levied under the revenue law of the state (Act 1869, p. 179). Section 17 of this act provides for the assessment and taxation of the property of canal, turnpike, railway. and other corporations, and makes it the duty of certain officers of these corporations to list, under oath, "all their personal property. which shall be held to include road-bed, depots, water stations, * * * and such other realty as is necessary for the daily business operations of said road," etc. 'Returns are to be made to the auditor of state, on or before the first Monday of March, annually, of the amount of such property situated in each organized county," etc. Taxes thus

assessed are collected by sale and distress of personal property (section 49); are made a special lien on real property (section 51); and real estate may be sold for delinquent taxes when the collector is not able to make the same by distress and sale of personal property (section 54). Under this act a list was furnished by the auditor of state to the officers of the complainant, and the general superintendent returned the company as having two hundred and forty-six miles of road in "Lincoln county and west of the state line," of the average value of $16,000 per mile. Upon this length of road, and upon this valuation, the county authorities of Lincoln county assessed the property of the company, the total valuation being (as alleged) $3,936,000, and the amount of taxes charged for the year 1869, is $45,264, for state, county, and school purposes; while for the same year, the said county, upon all other persons, corporations, and property, only levied taxes to the amount, in the aggregate, of $6,350. The pleadings show that the county of Lincoln is the most westerly organized county in the state, through which the road of the complainant runs; that immediately west of Lincoln county is a large tract of unorganized territory, west of which, and extending to the west line of the state, is the unorganized county of Cheyenne. The road runs through this unorganized territory, as well ·as through Cheyenne county. By the averments of the bill, supported by affidavits, it would appear that the length of complainant's road through Lincoln county, to the west line of the state. instead of being two hundred and forty-six miles, is only about one hundred and sixty-six miles, of which but eight miles are in Lincoln county (the road crossing only a corner of the county), and the residue of the one hundred and seventy-six miles is in Cheyenne county (one hundred and five miles), and in the unorganized territory between that and Lincoln county, (sixty-three miles).

The bill seeks to restrain the collection of the tax. for the three following reasons: 1. Because two hundred and forty-six miles of road-bed have been assessed by the authorities of Lincoln county; whereas only one hundred and seventy-six miles of the road-bed are situate in Lincoln county and the attached territory west of it, to the state line. 2. Because Lincoln county is not, by law. authorized to tax any portion of the road-bed or property of the defendant, except such as is situate within its geographical limits. 3. Because the state of Nebraska has no power to subject to taxation, for state purposes. the road-bed, rolling-stock, and other property necessary for the use and operation of the complainant's road; such power resting. as it is claimed, exclusively in the government of the United States.

On the 15th day of February, 1869, the

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 18 Wall. (85 U. S.) 5.]

legislature of Nebraska passed an act "to define the western boundary of Lincoln county;" and, after defining it, the act makes this important provision, to-wit: "That all the unorganized country lying west of the western boundary of Lincoln, and east of the east line of Cheyenne county, and south of the North Platte river, be and the same is hereby attached to the said county of Lincoln for judicial and revenue purposes, and that the county of Cheyenne be and the same is hereby attached, for judicial and revenue purposes, to said county of Lincoln." Laws Neb. 1869, p. 249. This act, as well as the revenue act, before mentioned, was approved on the 15th day of February, 1869, and each went into effect from its passage.

The more material provisions of the acts of congress relating to the Union Pacific Railroad Company, may be here conveniently mentioned. The company was incorporated by act of congress of July 1, 1862 (12 Stat. 489). This act was subsequently amended in some essential particulars, especially by the act of July 2, 1864 (13 Stat. 386). The incorporating statute is entitled, "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure the government the use of the same for postal, military, and other purposes." By this act, congress incorporated certain individuals, their associates and successors, as the "Union Pacific Railroad Company," with authority to build a continuous railroad and telegraph from a point on the one hundredth meridian to the western boundary of Nevada territory. It fixed the amount of the capital stock and shares, and declared that "the stockholders should constitute said body politic and corporate." The government has no stock in the road, though it has five directors, not stockholders, against fifteen company directors. The act grants the company the right of way through the public lands; and, "for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and the public stores thereon," makes it an extensive grant of lands, and provides for the issuing of patents therefor. And, for the same purposes, the United States agreed to, and did issue its thirty-year six per cent bonds to the company, to the amount of $16,000 per mile, for each section of forty miles; which bonds, the original act declared, "shall, ipso facto, constitute a first mortgage on the whole of the railroad and telegraph, together with the rolling stock, fixtures, and property of every kind," and made specific provision as to proceedings, on the failure of the company, to redeem the bonds. By the act of July 2, 1864, this was changed, and the company authorized to issue its

"first mortgage bonds, to an amount not exceeding the bonds of the United States," and the lien of the United States bonds was declared to be subordinate to the bonds so issued by the company, with the exception relating to the transportation of dispatches, troops, mails, etc., for the government. These grants to the company are declared to be "made upon condition (1) that the company shall pay the bonds of the United States at maturity; (2) shall keep their line and road in repair and use; (3) transport mails, troops, etc., giving the government the preference, at fair and reasonable rates of compensation, the amount thus earned to be applied in payment of the bonds, as well as five per cent of the net earnings of the road after its completion. By the 17th section of the act it is provided if the road, when finished, is for any unreasonable time permitted to remain out of repair, or unfit for use, congress is authorized to put the same in repair and use, and re-imburse the government for expenditures thus caused, from the income of the road. The 18th section provides that when the net earnings of the road exceed ten per cent of its cost, congress may reduce, fix, and regulate rates of fare thereon, and declares that "the better to accomplish the object of this act, to-wit: to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order; and to secure the government, at all times (but particularly in times of war), the use and benefits of the same for postal, military, and other purposes. congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act." The act also contains provisions that, so far as the public and government are concerned, the said railroad and branches shall be operated as one connected and continuous line. There is no provision in any act of congress relating to this company respecting the taxation of it, or its property, by the states through which its road may run. At the date of the passage of the act incorporating the company, Nebraska was in a territorial condition under the act of 1854, organizing the territories of Nebraska and Kansas. In 1867, Nebraska was admitted into the Union "upon an equal footing with the original states, in all respects whatever." By the enabling act of congress of April 10, 1864, Nebraska was required to, and subsequently did, in her constitution, disable herself from taxing "lands or property therein belonging to, or which may hereafter be purchased by, the United States;" and accordingly her revenue laws, in terms, exempt from taxation the property of the United States. The case is now before the court on a motion by the complainant, that the injunction allowed by the district judge be continued until the final hearing.

A. J. Poppleton and E. Wakely, for complainant.

J. M. Woolworth, for defendant.

Before DILLON, Circuit Judge, and DUNDY, District Judge.

DILLON, Circuit Judge. I. The authorities of the state of Nebraska have assessed and levied, for the year 1869, taxes upon the property of the Union Pacific Railroad Company situate therein. The company brings the present bill, in this court, to restrain the collection of these taxes. No question is made concerning jurisdiction. The cause is before the court on the motion of the company to continue in force the injunction allowed in vacation, and has been ably argued by counsel, on the merits of the application.

One of the grounds for the injunction is fundamental in its nature, and if well taken is decisive, not only of the present case, but against the power of the state, in any event, to subject the property of the company to taxation by its authority. To this ground, therefore, we shall first direct our attention. It is that the state of Nebraska has no power to levy a tax upon any property of the Union Pacific Railroad Company which is appurtenant to, or necessary for, the use and operation of its road. The argument in support of this proposition is, that the corporation was created by congress, and not by the state; that it was created because deemed by congress a fit instrumentality or means of exercising the constitutional powers of carrying .on, promoting or facilitating the operations, or executing the duties of the general government, and that if it be such instrumentality or means, it is settled that it is beyond the taxing power of the state.

Reliance is placed upon the cases of McCulloch v. Maryland, 4 Wheat. [17 U. S.] 316, and Osborn v. Bank of U. S., 9 Wheat. [22 U. S.] 738, in which it was held by the supreme court that this bank, "as the great instrument by which the fiscal operations of the government were effected," and "as a public corporation, created for public and national purposes," was not, on its capital or in its operations, taxable by the states. In a word, it is claimed by the company that as respects immunity from taxation, it stands precisely in the situation of the bank, and that taxation of it by the states is unconstitutional, for the same reasons that in those cases the laws of Maryland and Ohio taxing the bank. were adjudged to be invalid.

The defendant controverts these propositions, and contends that the Union Pacific Railroad Company. though chartered by congress, is essentially a "private corporation, whose principal object is individual trade and individual profit, and not a public corporation, created for public and national purposes;" and denies that it is an instrument. agency, or means of the general government, in such a sense as, on this ground, to exempt it by necessary implication from taxation by the states. The cases referred to undoubtedly establish the doctrine that no state has the right to tax the means, agencies, or instrumentalities rightfully employed within the states by the general government for the execution of its powers; and this doctrine is adhered to, and, when understood with the necessary qualifications, declared to be sound by the supreme court, in its latest adjudications on the subject. Thompson v. Pacific R. R., 9 Wall. [76 U. S.] 579, 591; National Bank v. Com., Id. 353, 361.

The doctrine of the implied exemption of federal instrumentalities from state taxation, its rationale, and its limitations, are so clearly stated by the learned justice assigned to this circuit, in the case last cited, that his observations may be advantageously extracted to aid our present inquiries. The case related to the right of the states to tax shares of the national banks, and "it is argued," says Mr. Justice Miller, "that the banks, being instrumentalities of the federal government, by which some of its important operations are conducted, cannot be subjected to such state legislation. It is certainly true that the Bank of the United States and its capital were held to be exempt from state taxation on the ground here stated, and this principle, laid down in the case of McCulloch v. Maryland has been repeatedly affirmed by this court. But the doctrine has its foundation in the proposition that the right of taxation may be so used in such cases as to destroy the instrumentalities by which the government proposes to effect its lawful purposes in the states, and it certainly cannot be maintained that banks or other corporations or instrumentalities of the government are to be wholly withdrawn from the operation of state legislation. * * * The principle we are discussing has its limitation,—a limitation growing out of the necessity on which the principle itself is founded. That limitation is, that the agencies of the federal government are only exempted from state legislation so far as that legislation may interfere with, or impair their efficiency in performing, the functions by which they are designed to serve that government. Any other rule would convert a principle founded alone in the necessity of securing to the government of the United States the means of exercising its legitimate powers, into an unauthorized and unjustifiable invasion of the rights of the states. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." [National Bank v. Com.] 9 Wall. [76 U. S.] 361, 362. The state legislation. then. to come within the operation of the principle, must relate not simply to an agent. but to an agency of the general government, and must be of a

character which incapacitates the agency to perform, or interferes with its efficiency in performing its duties to the government, or it must (as in the case of a tax, which if valid at all, is valid to any extent the state may see fit to press it), assert a principle in its nature antagonistic to the federal instrumentality, and which may be exercised to destroy it.

Having thus defined and limited the principle on which the company relies as exempting it from the right of the state to tax its property, the next step in the inquiry is to determine whether this corporation is a federal instrumentality, within the meaning of the rule, and one which might be destroyed by the state if it was permitted to tax it.

Upon the most careful examination of the acts of congress relating to this company, and upon the best reflection I have been able to give the subject, I am of opinion that the interest of the government in the corporation, though organized under congressional authority, is not such as will bring it within the principle of implied exemption from the taxing power of the state. That there is, in any act of congress, an express provision on the subject of taxation, or a prohibition to the state to tax the company, is not claimed.

The Union Pacific Railroad Company is a private corporation, in the sense that all of its capital stock is owned by the stockholders, and these constitute the corporate body. The government has no stock in the road. But, in another sense, the corporation is a public one as respects the government, and the relations it sustains to the government are very peculiar. The government created the corporation, and both authorized and aided the building of the road. It was to be constructed within the territories of the United States; and if congress was not the only power which could erect said corporation, and authorize it to build the road therein, it is certain that no road could have been constructed through the national domain against the will of congress.

The purpose of congress is manifest, not only from the nature of the legislative provisions, but from the plain expression of it, both in the title and in the body of the incorporating act. It is declared in the 18th section that "the object of this act is to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes," and to this end "congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act." And to the same effect is the title, which is, "An act to aid in the construction of a railroad, etc., and to secure to the government the use of the same for postal, military, and other purposes."

The government aided the corporation by giving it the right of way, by granting it lands, and by issuing to it bonds which were originally the first, but, by the consent of congress, subsequently became the second, mortgage or lien on the road. Now, the act shows (sections 6, 17, 18) that the grants of corporate existence, of the right of way, of lands, and of pecuniary aid, were all made upon the condition or consideration that the corporation should build the road and keep it in repair and operation, so that the government might at all times have the use and benefit of the same for postal, military, or other purposes. To prevent this object from being defeated, congress reserved the right to repair and run the road (section 17), and at all times to legislate generally with respect to the rights of the company (section 18). The ownership of the road and its property is in the corporation. Its bonds, by the consent of congress, have been made a first mortgage; and the government bonds are the second mortgage "on the whole line of railroad and telegraph, together with the rolling stock, fixtures, and property of every kind and description." See Act July 1, 1862, § 5, and Act July 2, 1864, § 10. If these first mortgage bonds are not paid, is it not clear that they may be foreclosed, and "the whole line of the road and all its property" be sold to the purchaser, who would thereby, as against the corporation and against the United States, acquire the title unless the United States redeemed the debt? Such purchaser would acquire the ownership of the road and its property, but he would not acquire these discharged of the duty of the corporation to keep the road in repair, and to run it as a continuous line in connection with the other roads, and to transport the mails, troops, stores, etc., of the government; nor would the sale under the mortgage divest the government of its reserved right of legislative control in order to secure to the government the purposes for which it created the corporation, and so bountifully aided it to execute its great undertaking.

So far as the government sustains to this road the mere relation of creditor or lien holder, such a sale, it may be true, would defeat or foreclose its rights as such a creditor or lienor, the same as in ordinary cases a second mortgage is cut off by a foreclosure and sale under the first. But so far as the government sustains political, public, or sovereign relations to the road, these remain, after such a sale, the same as before. The sale does not annihilate the corporation as a legal personality, nor, in my opinion, was it destroyed, or the legislative control of congress over it abridged, by the subsequent admission of Nebraska into the Union as a state.

Congress gave the corporation, in terms, the power to make contracts, which includes the power to incur indebtedness, for which it was declared liable to be sued. It cannot be maintained, I suppose, that the corporation, having

become indebted, would not be authorized, the same as other corporations, to appropriate its property to pay its debts; or, that being sued, and judgment passing against it, its property could not be reached, and, if necessary, sold or otherwise judicially appropriated to the satisfaction of the judgment. If thus sold, the purchaser, as in case of the sale under mortgage, would take a title subject to all the conditions of the constituent statute of the corporation, and all the duties and liabilities of the corporation to the United States, not of a nature to be destroyed by the sale or transfer.

Judge Shepley has recently decided that the words of the bankrupt act, "all moneyed, business, or commercial corporations," include railroad corporations, which are consequently liable to be adjudicated bankrupts thereunder. Adams v. Boston, H. & E. R. Co. [Case No. 47]. He also held, following Hall v. Sullivan R. Co. [Id. 5,948], that under the bankrupt act, certain franchises, but not the franchise to be a corporation, were alienable in their nature, and were subject to sale and to transfer at the instance of creditors; but "the purchaser," he says, "must take his title subject to all the conditions of the original grant, and subject to all duties and liabilities to the state," &c. If this view of the bankrupt law is correct, I see no reason why the act would not include the Pacific Railroad corporation as well as others. The franchise to be a corporation is one thing, and the franchise of carrying on its business and taking tolls is another. The one cannot be aliened without a clear provision of law to that effect, while the other franchises are alienable in their nature. This distinction is plainly drawn by Mr. Justice Curtis in his elaborate opinion in Hall v. Sullivan R. Co., first published in Pierce, R. R. p. 520, note, and since reported [Case No. 5,948]. This eminent jurist says: "The franchise to be a corporation is therefore not a subject of sale and transfer, unless the law, by some positive provision, has made it so, and pointed out the modes by which such sale and transfer may be effected. But the franchise to build, own, and manage a railroad, and to take tolls thereon, are not necessarily corporate rights; they are capable of existing in and being enjoyed by natural persons. and there is nothing in their nature inconsistent with their being assignable."

The purpose of these illustrations, and their bearing on the question under consideration, are manifest. In its nature a tax is a debt or liability, though of a peculiar character, and whose enforcement. for reasons of expediency, is usually provided for by a summary sale of property, though it might in all cases. and sometimes is directed, or allowed to be enforced. by an ordinary action.

Congress had the power to create this corporation; it had the power to make its grants conditioned upon the performance by the corporation of certain duties; the power to reserve legislative control over it, as it did, and

these and other provisions of the act intended to secure to the government the use of the road for postal, military, and other public purposes, are not abrogated or abridged by the subsequent admission of Nebraska into the Union as a state, and these rights are inalienable in their nature without the consent of congress, and not destructible by any act of the company. The property of the company and the right to operate the road may be sold or transferred, under the mortgage, or otherwise, or, it may be, under a sale for taxes, but the purchaser in either case will take his rights, subject to the fundamental conditions on which the corporation exists, and subject to its public duties and liabilities to the government. The state cannot tax this corporation out of existence. It cannot sell or destroy its franchise (derived from congress) to be a corporation. The public duties which it owes to the government it will owe into whosesoever hands its other subordinate and assignable franchises or property may pass. So far as the rights of the government are those of a mere creditor, it may be true that it would be affected by a sale, the same as any other creditor with like rights, but this is an inquiry into which it is not necessary now to enter.

I conclude this discussion by stating that it results from the foregoing views:

1. That the Union Pacific Railroad Company is not an instrument of the government in such a sense as exempts it, by implication, from the taxing power of the state through which its road may be located.

2. If it be in any sense a federal instrumentality, the rights of the government, under the incorporating act, are fully protected and reserved, and any rights derived from a sale for taxes, under state authority, are entirely subordinate to the original, paramount, and indefeasible rights of the general government; cannot destroy the corporation nor incapacitate it from discharging any of its inalienable, fundamental, and organic duties to the government. If so, then the case falls without the principle on which the corporation relies to sustain its application for an injunction.

I think I can discover, in the more recent judgments of the supreme court, evidences of a conviction on the part of the judges that the doctrine of implied exemption of federal agencies from state taxation has been carried quite to its limit, and that it will not be pressed to embrace a case of the character of the one now under consideration.

II. It is next claimed by the company that there is no authority in Lincoln county to tax any portion of the road situate beyond its limits. But in my judgment. the act of the 15th day of February, 1869 (Laws Neb. 1869, p. 249). is sufficient to authorize the action of the county in taxing the road-bed situate west of it. This act. in terms, attaches the county of Cheyenne and the unorganized territory to Lincoln county "for judicial and revenue pur-

poses," and is to be construed in connection with the revenue act, enacted at the same time. Thus, to the word "county," as occurring in the general revenue act (section 17) is to be annexed by construction as respects the county of Lincoln, the words "and attached territory." The same language which annexes it for revenue purposes is that adopted in this and other acts of the state for annexing unorganized territory to organized counties for judicial purposes. It has always been regarded as sufficient for the latter purpose, and, if so, it is equally so for the former, and great mischief would undoubtedly flow from any new view on this subject.

III. The only remaining ground for the injunction is, that conceding the road is taxable, and that the county of Lincoln has authority to tax all the road west of it to the state line, there are, in fact, only one hundred and seventy-six miles of road, while the county has assessed and is seeking to collect a tax upon two hundred and forty-six miles—seventy miles more than have any existence. The difference in the tax is over $12,000, and if the company is right that these seventy miles have no existence, it would strike the mind as unconscionable for the authorities of the state to insist upon availing themselves of the mistake by which this amount was erroneously assessed. But whether equity can relieve I prefer to determine when the precise facts are ascertained; and meantime as to this, I will order the injunction to be continued in force; but in other respects it will stand dissolved. Ordered accordingly.

Railroad companies are not exempt from taxation by reason of the government owning interests in the companies.
[On appeal to the supreme court, the judgment of this court was affirmed. 18 Wall. (85 U. S.) 5. See, also, Cases Nos. 14,379 and 14,380.]